Entered on Docket
November 15, 2010
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



Signed and Filed: November 10, 2010

_____
THOMAS E. CARLSON
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>DAVID SALMA,<br>          Debtor. | Case No. 09-30863 TEC<br>Chapter 7 |
| LEW JENKINS and LINDA JENKINS, as Trustees of the Jenkins Trust U/A/D 1/15/98 and JACK H. FRESKOS, beneficiary of IRA 042640 at WESTAMERICA,<br>          Plaintiffs,<br>vs.<br>DAVID SALMA, RUBEN Q. PICARDO, SEATTLE BLOCK, LLC, FATON BINAKU, and MARION ZABORSKI, and DOES 1-10,<br>          Defendants. | Adv. Proc. No. 09-3126 TC |

**MEMORANDUM DECISION RE DEFENDANT DAVID SALMA'S RULE 52(c) MOTION**

The court held a trial in this action on November 2-3, 2010. Julia M. Wei and Simon Offord appeared for Plaintiffs. Paul Ham appeared for Defendant David Salma (Defendant).[1] At the close of Plaintiffs' case, Defendant made a motion for entry of judgment in his favor. For the reasons

---

[1] The other defendants were dismissed from this adversary proceeding by order dated September 17, 2009.

-1-

stated below, which shall constitute the court's findings of fact and conclusions of law, Defendant's motion is granted and judgment is entered for Defendant.

BACKGROUND FACTS

Defendant owned an apartment building at 1900 Eddy Street, San Francisco, California (the Property). In July 2006, Plaintiffs loaned Defendant $1.67 million secured by a junior deed of trust on the Property (the Loan). Before making the Loan, Plaintiffs obtained a copy of an appraisal prepared in March 2006 by Property Sciences Group (the Appraisal). The Appraisal stated the "As-Is Market Value" of the Property to be $7.67 million, and the "Prospective Value" of the Property to be $7.8 million. Either value was sufficient to secure repayment of both the $4.2 million senior loan and Plaintiffs' $1.67 million junior loan. The Appraisal had been performed for Far East National Bank, from whom Defendant had also sought a loan.

In late Summer 2007, Defendant fell behind in payments to both lenders. In January 2008, the holder of the senior deed of trust commenced judicial foreclosure proceedings and secured the appointment of a receiver. In April 2008, Plaintiffs obtained an updated appraisal, which indicated that the Property was worth only $4.4 million. On April 18, 2008, the holder of the senior deed of trust conducted a non-judicial foreclosure sale, from which Plaintiffs received no payment.

In March 2009, Plaintiffs sued Defendant under the promissory note and obtained a judgment in the amount of $2,163,632 (the Judgment). In April 2009, Defendant filed a chapter 7 petition in this court, seeking to discharge his liability under the Judgment.

In the present action, Plaintiffs seek to have this court determine that Defendant's liability under the Judgment is excepted from discharge under 11 U.S.C. § 523(a)(2), on the basis that the liability arose out of a fraud perpetrated by Defendant. Plaintiffs assert that Defendant knowingly supplied an inflated rent roll to Far East National Bank (the Bank), which forwarded that rent roll to Property Sciences Group, which used the inflated rent roll in calculating the value shown in the Appraisal. Plaintiffs assert that in making the Loan they relied upon the $7.67 million value specified in the Appraisal, and would not have made the Loan had the appraised value been calculated from an accurate rent roll.

Plaintiff introduced credible evidence that the rent roll supplied to the appraiser reported rent substantially in excess of the rent actually due from tenants. Plaintiffs established the rent actually

-2-

due through the testimony of the court-appointed receiver, who described his review of written leases and his examination of the amount of rent that each tenant had actually paid during the months prior to the receiver's appointment. The Plaintiffs established the contents of the rent roll supplied to the appraiser by introducing the copy of the rent roll attached to the Appraisal. The difference between the rent roll and the rent actually due is shown in the following table.

| Residential Units | Rent Reported on Rent Roll | Rent Actually Due per Receiver[2] |
|---|---|---|
| 1 | $1,508 | $ 500 |
| 2 | 1,505 | 1,500 |
| 3 | 1,600 | 1,550 |
| 4 | 1,550 | 1,000 |
| 4A | 1,350 | 1,100 |
| 5 | 1,620 | 1,550 |
| 5A | 1,700 | 100 |
| 6 | 1,600 | 1,550 |
| 7 | 1,600 | 1,950 |
| 8 | 1,579 | 1,350 |
| 9 | 3,300 | 1,800 |
| 10 | 1,600 | 995 |
| 11 | 1,484 | 2,500 |
| 12 | 1,273 | 1,800 |
| 15 | 1,300 | 1,050 |
| 16 | 1,286 | 1,450 |
| 17 | 1,250 | 800 |
| 18 | 1,250 | 1,150 |
| 19 | 1,260 | 1,075 |
| TOTAL RESIDENTIAL | $28,015 | $24,770 |
| | | |
| Commercial Units | | |
| Pearl Market | | 3,025 |
| Commercial 1 | 3,625 | |
| Commercial 2 | 3,400 | |
| Commercial 3 | 4,500 | |
| Commercial 4 | 2,500 | |
| TOTAL COMMERCIAL | $14,025 | $3,025 |
| | | |
| TOTAL ALL UNITS | $42,040 | $27,795 |

More than two-thirds of the difference between the rent roll and the rent actually due is attributable to the commercial space. This difference results from the fact that the rent roll was based

---

[2]Amounts shown reflect rent only and do not include amounts paid for parking space.

-3-

on the assumption that the single existing commercial tenant, paying only $3,025, would vacate the premises by May 1, 2006 and would be replaced by four new tenants paying a total of $14,025. The four new commercial leases never went into effect, because Defendant was unable to evict the existing tenant, who paid the much lower rent shown on the receiver's report. The appraiser assumed the new leases would go into effect, but was unable to verify that fact, because he completed the Appraisal before the new tenants were to move in.

The Appraisal did, however, contain a conspicuous warning that the value stated was dependent upon the rent to be derived from the new commercial leases. The second page of the Appraisal states:

> 1. Extraordinary Assumption–Prospective Value
> This appraisal contains a perspective [sic] value. At the time of inspection, a single tenant occupied the subject's commercial space. According to the owner, the single commercial tenant is to vacate the commercial space by May 1, 2006, at which time the space will be devised in to three smaller spaces, which have been leased to three separate tenants. Additionally, the owner has recently come to an agreement with T-mobile to place a cellular antenna site on the subject's rooftop, from which the owner will receive additional income. We were furnished with agreements for the prospective tenants and cellular tenant site that we have assumed to be authentic. *If there are significant changes and/or significant deviations from the information provided herein, then this appraisal would be invalid and alternative value conclusions may be necessary.* (emphasis added).

Before making the Loan, Plaintiffs had an opportunity to determine whether the new commercial leases had gone into effect. The new leases were to go into effect May 1, 2006, and Plaintiffs did not fund the Loan until mid-July 2006. Despite the express warning that the value stated in the Appraisal was dependent upon the four new commercial leases, Plaintiffs did not investigate whether those leases had gone into effect. Had they done so, Plaintiffs would have discovered that Pearl Market had not vacated the premises on May 1st, that Defendant had filed an unlawful detainer action against Pearl Market, that Pearl Market contested that action, and that the dispute had not been resolved by the date Plaintiffs made the Loan. The unlawful detainer action was ultimately resolved in favor of Pearl Market, which is why the receiver was able to collect only $3,025 from the commercial space in early 2008.

At the end of the second day of trial, Defendant moved for entry of judgment on the basis that Plaintiffs' evidence did not show that Plaintiffs' reliance on the Appraisal was justifiable in light of

-4-

the express warnings in the Appraisal regarding the commercial leases and Plaintiffs' failure to investigate the status of those leases.

Plaintiffs had not examined all of their witnesses at the time Defendant made his motion for judgment. At a prior trial scheduling conference, the parties had asked the court to reserve three days for the trial, and in accordance with that request, the court scheduled the trial for Tuesday-Thursday November 2-4, 2010. On the morning of the first day of trial, Plaintiffs' counsel reported that one of Plaintiffs' witnesses, Paul Chandler, was unable to attend any of the three days scheduled for the trial, but would likely be available on the day following the last day scheduled for trial (Friday, November 5). Mr. Chandler prepared the Appraisal that Plaintiffs relied upon, and that Plaintiffs contend was influenced by a fraudulent rent roll prepared by Defendant. Counsel represented that she had subpoenaed the witness, and that the witness told her he was unavailable because he was testifying in another trial on the dates scheduled for this trial. By the end of the second day of trial, when Defendant made his motion for entry of judgment, Plaintiffs had called all of their other witnesses. In evaluating Defendant's argument regarding justifiable reliance, and in determining whether to extend the trial to permit Plaintiffs to call Mr. Chandler, I assume that Plaintiffs have made a prima facie case with respect to all other elements of their claim without Mr. Chandler's testimony.

DISCUSSION

To prove claim that a debt is nondischargeable under section 523(a)(2)(A), a creditor must establish: (1) a misrepresentation, a fraudulent omission, or deceptive conduct by the debtor, (2) knowledge of the falsity or deceptiveness of debtor's statement or conduct; (3) intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 (9th Cir. 2001).

Justifiable reliance is a subjective test that turns on the qualities and characteristics of the particular plaintiff, including the plaintiff's level of sophistication and intelligence, and the circumstances of the particular case. Field v. Mans, 516 U.S. 59, 70-72 (1995).

> It is only where, under the circumstances, the facts should be apparent to one of [the plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered

something which should serve as a warning that he is being deceived, that he is required to make an investigation of this own.

Id. at 71-72 (citation omitted).

Plaintiffs' own testimony indicates that they are sophisticated investors. Mr. Jenkins was formerly the CEO of a computer software firm. He sold his company several years ago, and since 1999 has primarily been an investor. He has made more than 10 real estate loans, investing as much as $11 million in such loans, which investments represented as much as 25 percent of his investment portfolio. Mr. Freskos was a real estate broker in California for 20 years. He has himself made more than 15 real estate loans, and has arranged many more such loans for others in his capacity a real estate broker.

Despite the conspicuous warning in the Appraisal, Plaintiffs did not verify that the new commercial leases had in fact taken effect before funding the Loan. They had ample time to do so. Plaintiffs did not fund the Loan until mid-July 2006, about ten weeks after the new commercial tenants were to move in and begin paying the higher rent upon which the appraised value was based. If Plaintiffs had done a minimal investigation, they would have discovered that the existing commercial tenant had not voluntarily vacated the premises in 2006 and was contesting the unlawful detainer action Defendant filed in March 2006.

Plaintiffs argue that their reliance on the Appraisal was justified notwithstanding the warning noted above, because the warning affected only the "Prospective Value" stated in the Appraisal ($7.8 million), not the "As-Is Market Value" ($7.67 million). They argue that they relied upon only the as-is value, which was sufficient to provide the 75 percent loan-to-value ratio they considered sufficient.

This argument has a superficial appeal that disappears as soon as one reads the appraiser's explanation of as-is value. The as-is value was not calculated using the rent paid by the single existing commercial tenant. Nor was it calculated from the fair rental value of the commercial space, determined without reference to either the pre-existing lease or the four leases expected to go into effect on May 1, 2006. The as-is valuation expressly assumes that the owner will collect the rent specified in the four new commercial leases, and adjusts only for the delay between the date of the

Case: 09-03126    Doc# 71    Filed: 11/10/10    Entered: 11/15/10 15:34:04    Page 6 of 11

Appraisal and the date the four new commercial leases were to commence.[3] *The as-is value takes no account of the contingency that the existing commercial tenant might not vacate, or that any or all of the four new commercial tenants for any other reason might not move in and pay the amount of rent the appraised value is based upon.*[4]

    I determine that Plaintiffs' reliance on the value stated in the Appraisal was not justifiable in light of: (1) Plaintiffs' sophistication and experience in real estate lending; (2) the clear warning in the Appraisal that the value was dependent upon the rent to be derived from four new commercial tenants who had not yet moved in; (3) the fact that Plaintiff had time to verify the status of those tenants before funding the loan, but did not do so; (4) the fact that a minimal investigation would have raised serious questions as to whether these new commercial leases would ever take effect; and (5) the fact that the difference between the existing commercial rent and the rent expected from these new commercial leases constituted more than two-thirds of the alleged understatement of rent by Defendant.

    In light of the above, it is also appropriate and fair to enter judgment for Defendant without extending the trial beyond its originally scheduled dates to enable Plaintiffs' counsel to examine the appraiser, Mr. Chandler. First, there is no evidence that Plaintiffs' counsel was surprised by Mr. Chandler's failure to appear at trial, and yet Plaintiffs' counsel failed to bring the matter to the attention of the court beforehand. The court was thus left with the option to either (1) require Defendant to put on its case before Plaintiff called Mr. Chandler, and extend the trial beyond the selected dates; or (2) extend the trial to Friday to listen to Mr. Chandler and then, if Plaintiffs established a prima facie case, extend the trial into the next week to hear Defendant's case. Second, and more important, it is extremely doubtful that Mr. Chandler's testimony would matter. While Mr.

---

[3] The as-is valuation identifies the four new commercial tenants by name, and states "No leasing commission has been deducted as all of the agreements have been executed." Appraisal at 65.

[4] The entire text of the discussion of as-is value on pages 63-65 of the Appraisal is attached as Appendix A.

-7-

Chandler could testify competently as to the effect of a false rent roll on appraised value,[5] his testimony would not be very helpful in determining whether Plaintiffs' reliance on that Appraisal was justifiable. That is a mixed question of law and fact peculiar to fraud claims on which a real estate appraiser would have little expertise. Thus, Plaintiffs have been "fully heard" on the issue of justifiable reliance, within the meaning of Rule 52(c), without the testimony of Mr. Chandler.

CONCLUSION

Defendant's motion for findings under Rule 52(c) should be granted and judgment should be entered for Defendant on the basis that Plaintiffs reliance on any misstatements of rental income was not justifiable under the facts and circumstances of this case.

Nothing stated above should be construed as a suggestion that Plaintiffs' counsel failed in presenting her clients' case. She was exceptionally well prepared, and she very effectively presented all the facts that favored her client. Defendant's counsel did an equally fine job, and prevailed because the language of the Appraisal so clearly warned that the value stated was contingent upon the Defendant actually getting four new tenants in place, and because Plaintiffs were not justified in relying upon the Appraisal without further investigation regarding that contingency.[6]

**END OF MEMORANDUM DECISION**

---

[5] For the purpose of Defendant's motion, the court assumes without deciding that rent rolls submitted by Defendant materially overstated actual rental income and thereby had a material effect on the value shown in the Appraisal.

[6] The court does not address Plaintiffs' post-trial Motion to Strike Portions of Defendant's Testimony, because the evidence in question is not relevant to whether Plaintiffs justifiably relied on the Appraisal.

1900 Eddy Street, San Francisco, CA 

As a result of our study and investigation, we conclude that the prospective market value of the subject property's Leased Fee Estate, as of October 1, 2006, subject to the Assumptions and Limiting Conditions included in the appraisal, will be:

> **PROSPECTIVE STABILIZED MARKET VALUE**
> **SEVEN MILLION EIGHT HUNDRED THOUSAND DOLLARS**
> **($7,800,000)**

## AS IS MARKET VALUE

The subject property consists of a multi-tenant retail/residential building with upper floor residential units and a ground floor retail space that is currently occupied by a single tenant. The single commercial tenant is to vacate the commercial space by May 1, 2006, at which time the space will be devised in to three smaller spaces, which have been leased to three separate tenants. The prospective market value is premised on the subject's ground floor commercial space being subdivided into three spaces and occupied at stabilized levels. In addition, the owner has recently come to an agreement with T-mobile to place a cellular antenna site on the subject's rooftop, from which the owner will receive additional income. The owner is expected to start receiving income from the cellular antenna approximately by October 1, 2006. The prospective market value takes into account the subject's additional income from the cellular antenna site.

The as is valuation takes into account the expenses necessary for the subject property to achieve the previously discussed occupancy and is reflective of the subject property as of our inspection on March 7, 2006.

In order for a property like the subject to achieve the prospective conditions, four additional expenses must be incurred: Renovation costs, Lost Rent, Leasing Commissions and an Entrepreneurial Incentive. These additional expenses are



explained and detailed in the following paragraphs. The sum of these expenses will be subtracted from the prospective market value, previously developed in the body of this report, and the resulting figure will be the as is market value.

### Renovation Costs

Prior to the commencement of the leases for the three retail spaces the owner needs to complete renovations, which include adding a devising wall between two of the spaces and constructing restrooms in two of the spaces. Additionally, separate utility meters will need to be installed. We were not provided estimated construction costs for the proposed renovation. The owner stated he estimates the renovation cost to be approximately $50,000. We have assumed a slightly higher cost of $86,800, which equates to approximately $40 per square foot of the subject's 2,170 square feet of retail space that is to be reconfigured. The estimated renovation cost is calculated as follows.

$$\$40/sf \times 2,170sf = \$86,800$$

### Rent Loss

To determine the as is market value, a deduction for lost rent is necessary. Lost rent is rent that is lost during the time period necessary for the recently signed leases to commence. Two of the subject's recently signed leases commence in May 1, 2006. As such, one month of rent loss will be incurred between then and the date of the as is value. As seen in the Reconstructed Rent Roll the scheduled rent for the leases that commence on May 1, 2006 is $3,625 and $3,400 per month.

Under the recent agreement with T-Mobile for placement of a cellular antenna on the subject's rooftop the owner will receive $1,800 per month in compensation. We contacted T-Mobile to confirm the agreement. T-Mobile confirmed the agreement and gave an estimated commencement date of October 1, 2006. As such, six months of rent loss will be incurred between then and the date of the as is value. The total rent loss is $17,825 and is summarized in the following table.



| Estimated Rent Loss | | | | | |
|---|---|---|---|---|---|
| Tenant | Use | Begin | Rent/Month | Months | Rent/SF |
| Brioche | Bakery | May-06 | $3,625 x | 1 = | $3,625 |
| Rami Barqawi | Laundry | May-06 | $3,400 x | 1 = | $3,400 |
| T-Mobile | Cellular Site | Aug-06 | $1,800 x | 6 = | $10,800 |
| Total | | | | | $17,825 |

### Leasing Commission

Typical leasing fees amount to 5% of the spaces gross rent for the first five years. No leasing commission has been deducted as all of the agreements have been executed.

### Entrepreneurial Incentive / Profit

A prudent Investor purchasing an un-stabilized property such as the subject would likely factor in a profit to account for the inherent associated risk. Given the size, location and the subject property type a profit or entrepreneurial incentive of 20% of the total costs is appropriate for the subject property.

| AS IS VALUATION | COSTS |
|---|---|
| **Stabilized Value Indication** | **$7,800,000** |
| Renovation Costs | ($86,800) |
| Rent Loss | ($17,825) |
| Leasing Commission | ($0) |
| **Stabilization adjustment** | **($104,625)** |
| Entrepreneurial Profit / Incentive 20% | ($20,925) |
| AS IS VALUE INDICATION | $7,674,450 |
| ROUNDED... | $7,670,000 |

Accordingly, the as is market value of the subject's Leased Fee Estate, as of March 7, 2006 subject to the Assumptions and Limiting Conditions included in the appraisal, was:

**AS IS MARKET VALUE**
*SEVEN MILLION SIX HUNDRED SEVENTY THOUSAND DOLLARS*
**($7,670,000)**